**Deronda SHEPPARD and Geraldine Sheppard, his wife, et al., Plaintiffs,**

v.

**A.C. & S. CO., et al., Defendants.**

Superior Court of Delaware,
New Castle County.
Submitted: April 29, 1985.
Decided: May 16, 1985.

Robert Jacobs, Thomas C. Crumplar, and Douglas B. Canfield, of Jacobs and Crumplar, Wilmington, for plaintiffs.

Douglas Catts, of Schmittinger and Rodriguez, Dover, Stuart Young, of Young, Conaway, Stargatt and Taylor, Wilmington, Scott Reese, of Cooch and Taylor, Wilmington, Jeffery S. Marlin, of Tybout, Redfearn, Casarino and Pell, Wilmington, J.R. Julian, of J.R. Julian Professional Ass'n, Wilmington, James T. McKinstry, of Richards, Layton and Finger, Wilmington, Michael Goodrick, of Theison, Lank, Mulford and Goldberg, P.A., Wilmington, James F. Kipp, of Trzuskowski, Kipp, Kelleher and Pearce, P.A., Wilmington, Howard M. Berg, of Howard M. Berg and Associates, P.A., Wilmington, James W. Semple, of Morris, James, Hitchens and Williams, Wilmington, James Perry, of Komissaroff and Perry, Wilmington, Somers S. Price, of Potter, Anderson and Corroon, Wilmington, John Elzufon, of Elzufon and Bailey, Wilmington, Michael J. Johnson, Biggs and Battaglia, Wilmington, Richard R.S. Hannum, of Prickett, Jones, Elliott, Kristol and Schnee, Wilmington, Richard Allen Paul, of E.I. duPont deNemours and Co., Inc., Wilmington, for defendants.

POPPITI, Judge.

The matter before the Court is a Motion for Summary Judgment by several defendants, based upon provisions of the statute of limitations, 10 *Del.C.* § 8119.[1] The undisputed facts are that plaintiff Deronda Sheppard (hereinafter plaintiff) was an employee at the E.I. DuPont deNemours and Co. Inc.'s (hereinafter DuPont) Edgemoor Plant in Edgemoor, Delaware from 1937 until 1938, and again from 1945 until 1975. The plaintiff alleges that during both time periods he was exposed to asbestos fibers in dangerous concentrations. The defendants in this action were engaged in the mining, manufacturing, or distributing of asbestos or asbestos-related products which the plaintiff alleges were supplied to DuPont.

Plaintiff's symptoms of illness first became apparent in the early 1970s, when he experienced shortness of breath.[2] In 1978

---

1. 10 *Del.C.* § 8119 provides, in pertinent part:

No action for the recovery of damages upon a claim for alleged personal injuries shall be brought after the expiration of 2 years from the date upon which it is claimed that such alleged injuries were sustained; ....

2. The medical record before the Court contains oblique references to the plaintiff's early symptoms and diagnoses. An x-ray report from Dr. Copman to Dr. Altschuler, dated September 4, 1979, states "views of the chest are compared with the last previous study of 1/2/74.... There is bilateral pleural thickening .... This finding was present on the previous examination and is slightly greater on the current study." In addition, a letter from Dr. Kestner to the medical superintendent of the DuPont Company, dated October 27, 1981, relates that x-rays dating from 1945 to the present were available for review, and it continues: "The film in 1945 appears normal. In 1970 changes of bilateral lateral pleural thickening ... begin to be seen. These changes persist through to a series of films, the most recent of which are dated 14 August 1981 ...."

While this suggests to the Court that the plaintiff may have experienced symptoms as early as 1974 and perhaps 1970, and while references to diagnoses of pleural disease are present in the record, there is no evidence of record that either symptoms or diagnoses were attributed to asbestos exposure such that plaintiff had notice of them. Indeed, Dr. Copman's letter to Dr. Altschuler of September 4, 1979 states: "It would be interesting to know if the patient has had [asbestos] exposure," suggesting that this may be the first consideration of a possible relationship between asbestos exposure and plaintiff's condition. In any event, the Court need not speculate on the interpretation to be made of references to the pre-1979 medical status of the plaintiff as the case is decided on other facts of record.

or 1979 he began to experience thickening of saliva and, in 1979, he had blood-streaked sputum and breathing problems. Apparently as a result of these more significant complaints he was examined by Dr. Robert G. Altschuler, a specialist in internal medicine, on September 28, 1979. In preparation for that examination, Dr. Louis Copman performed a chest x-ray. Dr. Copman interpreted the x-ray and forwarded the results in a written report to Dr. Altschuler by letter dated September 4, 1979. Therein Dr. Copman articulated his medical diagnosis as follows:

IMPRESSION: BILATERAL PLEURAL THICKENING ALONG THE LATERAL CHEST WALLS, GREATER ON THE LEFT, WHICH HAS INCREASED VERY SLIGHTLY SINCE THE PREVIOUS EXAMINATION OF 1/2/74 AND IS BELIEVED TO BE A MANIFESTATION OF ASBESTOSIS. IT WOULD BE INTERESTING TO KNOW IF THE PATIENT HAS HAD SUCH EXPOSURE. THERE IS NO MANIFESTATION OF ACTIVE PULMONARY DISEASE....[3] (Underscore added.)

As a result of the x-ray and the accompanying report, Dr. Altschuler during the September 28, 1979 examination discussed with plaintiff his possible exposure to asbestos. Plaintiff recalls discussing his previous exposure to asbestos-containing products with Dr. Altschuler during that examination and further recalls that Dr. Altschuler advised him that he thought he was suffering from pulmonary asbestosis.

Dr. Altschuler again saw plaintiff on December 5, 1979 and again discussed with plaintiff his impression that plaintiff was suffering from an asbestos-related health problem. As a result of this examination plaintiff was referred to Dr. John J. Cha-

---

**3.** Asbestos-caused or asbestos-related diseases may be divided into malignant and non-malignant diseases. *Insurance Co. of North America v. Forty-Eight Insulations,* 451 F.Supp. 1230, 1236 (E.D.Mich.1978), *aff'd,* 633 F.2d 1212 (6th Cir.1980), *supplemental opinion,* 657 F.2d 814, *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), *reh'g denied,* 455 U.S. 1009, 102 S.Ct. 1648, 71 L.Ed.2d 878 (1982). The following is a non-exhaustive list of asbestos-related diseases categorized for purposes of clarifying the terms applicable to the instant case.

I. *Nonmalignant diseases.*
 A. Pulmonary asbestosis/Parenchymal asbestosis.
 B. Asbestos-related pleural disease/Pleural asbestosis. Pleural thickening is one major development of asbestos-related pleural disease. Other manifestations not germane to this inquiry include pleural effusion, hyaline plaques, and calcified plaques.
II. *Malignant diseases.*
 A. Lung cancer/Pulmonary carcinoma/Bronchogenic carcinoma.
 B. Mesothelioma (tumor of the mesothelial surface).
Mansfield, *Asbestos: The cases and the Insurance Problem,* 15 Forum 860, 861–64 (1980); Affidavit of Dr. Susan M. Daum (May 25, 1984); *Forty-Eight Insulations, supra.*

The non-malignant diseases may result when the body reacts to the inhalation of asbestos fibers which become imbedded in lung or other tissue. The reaction consists of the body "walling off" the foreign matter with fibrous cells such that it eventually produces scar-like tissue which builds up over many years. *Forty-Eight Insulations, supra* at 1236–1237. Pulmonary asbestosis or parenchymal asbestosis occurs within the lungs; pleural asbestosis occurs in the pleural cavity. Pleural thickening, one of the manifestations of pleural asbestosis, may occur independent of or in conjunction with pulmonary asbestosis. 15 Forum 860, 862–863. Each of the diseases, i.e., pulmonary asbestosis, asbestos-related pleural disease, lung cancer, and mesothelioma, is recognized as a separate, and distinct disease. Affidavit of Dr. Susan M. Daum at ¶¶ 14–16.

Alternate terminology is listed in the above scheme because the alternatives are prevalent in medical records. In addition, medical personnel may refer to "asbestosis" when they clearly intend "pulmonary asbestosis." (*viz.,* Dr. Daum's affidavit of May 25, 1984, "Mr. Sheppard has the separate diseases of asbestos-related pleural disease and asbestosis"). Pleural thickening or asbestos-related pleural disease, on the other hand, appear to be the preferred terms rather than pleural asbestosis. The Court is satisfied that, in the medical records before the Court in this case, the term "asbestosis" refers to pulmonary asbestosis; that "pleural thickening" and "asbestos-related pleural disease" are synonymous; and that "pleural thickening" and "asbestos-related pleural disease" refer to a disease separate and distinct from pulmonary asbestosis. The Court finds it ironic, however, that this matter, which turns on medical evidence, is based upon a record replete with such terminology and yet lacks evidence of efforts to distinguish the medical terms.

balko, a pulmonary specialist who examined the plaintiff on January 3, 1980. He forwarded a report to Dr. Altschuler on January 8, 1980 which reads in pertinent part as follows:

His occupation for 43 years has been as a welder of all types of metals.... There has been a rare asbestos exposure when he either applies or removes insulating material from pipes. The work has occurred both outdoors and indoors. He occasionally has sawed pieces of asbestos as well. He feels that his exposure or potential exposure to asbestos has been very minimal.

My assessment at this time is a man with a long history of cigarette smoking and a history compatible with chronic bronchitis which appears to be improving. The history of hemoptysis six months ago is a bit bothersome especially in a person who has been a cigarette smoker. Mr. Sheppard seemed to pass this off as being not very important. Bronchoscopy is usually indicated in patients who have history of cigarette smoking and hemoptysis in that endobronchial malignancy can be responsible for this symptom. The presence of bilateral pleural disease in a patient with asbestos exposure certainly raises the possibility that the pleural disease is consequent to asbestos exposure. I could find no other good explanation for its presence.

Mr. Sheppard seemed somewhat reluctant to have investigations performed although I did not mention the possibility of bronchoscopy. I did, however, schedule him for a pulmonary function evaluation and arterial blood gases to be performed at St. Francis. These results will be reported to you. Mr. Sheppard was not interested in any further follow-up at this office.... Insofar as his pleural disease is concerned, I think it would be reasonable to follow this along with chest x-rays at regular intervals. Oblique views might help in visualizing additional pleural disease or calcification of the diaphragm. If things continue to

progress, we should consider pleural biopsy. (Underscore added.)

Because the plaintiff was still experiencing breathing problems in 1981, Dr. Altchuler referred him to Dr. Zakir Hossain, a thoracic and cardiopulmonary specialist. Dr. Hossain performed a bronchoscopic examination on January 21, 1981 and filed a report with Dr. Altschuler by letter dated January 27, 1981 which reads in pertinent part as follows:

My clinical impression at this time is that he is suffering from chronic bronchitis secondary to chronic cigarette smoking.

On September 23, 1981 at the request of the DuPont Company, the plaintiff was examined by Dr. Joseph F. Kestner, a pulmonary specialist and associate of Dr. Chabalko. Dr. Kestner filed a report with the DuPont Company which reads in pertinent part as follows:

His chest radiographs show bilateral lateral pleural thickening and his pulmonary function tests support the presence of minimal obstructive impairment....

The bilateral lateral pleural thickening seen on chest radiographs is most likely related to previous asbestos exposure. (Underscore added.)

Finally on May 24, 1982, the plaintiff was examined by Dr. Susan Daum, an occupational disease specialist. As a result of the examination and some tests Dr. Daum concluded that the plaintiff had asbestosis as well as asbestos-related pleural disease, and she so informed him. The instant suit was filed on December 6, 1982.

There is no dispute that the provisions of the two-year statute of limitations, 10 *Del.C.* § 8119, govern the case at bar. The statute provides that the limitations period begins to run "from the date upon which it is claimed such injuries were sustained." Plaintiff argues in essence that in the case at bar the statute began to run from the date of the actual clinical diagnosis of asbestosis by Dr. Daum on May 24, 1982. On the other hand, the defendants' position is

that the cause of action is time-barred due to presence of general symptoms, namely, shortness of breath, as early as 1974 and actual physician-identified clinical symptoms of asbestos-related health problems by Dr. Altschuler and Dr. Copman in 1979. The diagnosis by Dr. Altschuler and Dr. Copman in 1979 was pleural thickening, the substance and etiology of which was communicated to and discussed with the plaintiff.

█ The issue as to when an injury is "sustained" within the context of an asbestos-related disease (an inherently unknowable disease) has recently been addressed by this Court in an opinion and order which was affirmed on appeal by the Delaware Supreme Court. *Stagg v. Bendix Corp.*, Del.Super., 472 A.2d 40, *aff'd,* Del.Supr., 486 A.2d 1150 (1984). It is therefore now settled law in Delaware that the discovery rule first articulated in the medical malpractice case of *Layton v. Allen,* Del.Supr., 246 A.2d 794 (1968) [4] applies to the claimed injury in the case at bar.

In *Stagg,* the plaintiff had sought medical attention for breathing problems more than two years before the filing of his cause of action. He claimed to have been assured by physicians that he was not suffering from asbestosis. It was not until he consulted a specialist in asbestosis diagnosis that he was advised that he had asbestosis, and he filed suit seven months after that diagnosis.

In ruling that the plaintiff's case was not time-barred as a matter of law, but rather that the question of the time of the discovery of the injury in question was a fact issue to be submitted to the jury, the Court stated:

It should be emphasized that the application of the *Layton* rationale to asbestos cases does not result in a "time of discovery" overlay in all such claims. The test is an individual one, with each claimant bearing the burden of demonstrating why the statute is not a bar. In each case the plaintiff must show not only an ignorance of the cause but also that he reacted reasonably and promptly in seeking a diagnosis of any untoward condition which is later confirmed medically as being asbestos related. This issue may prove to be a factual one to be resolved at trial. It is sufficient in this case to note that the plaintiff's proofs establish his blameless ignorance of an inherently unknowable injury.

In summary, I conclude that given the prolonged and inherently unknowable latency of plaintiff's disease, the period of limitations became effective when he was chargeable with knowledge that his physical condition was attributable to asbestos exposure.

*Stagg, supra,* 472 A.2d at 43.

In affirming the ruling of the Superior Court in *Stagg, supra,* the Supreme Court stated as follows:

The Trial Court summarized that, "the period of limitations became effective when he [plaintiff] was chargeable with knowledge that his physical condition was attributable to asbestos exposure" 472 A.2d at 43. We do not find that summary inconsistent with hour holding in *Layton* that the injury is sustained "when the harmful effect first manifests itself and becomes physically ascertainable." 246 A.2d at 798.[5]

*Bendix Corp. v. Stagg,* 486 A.2d at 1154.

The teaching in *Stagg, supra,* was applied in the case of *Nutt v. A.C. & S. Co.,*

---

**4.** *See* other cases articulating the *Layton* time of discovery standard, *Isaacson, Stolper & Co. v. Artisan's Savings Bank,* Del.Supr., 330 A.2d 130 (1974); *Child, Inc. v. Rodgers,* Del.Super., 377 A.2d 374 (1977); *Hamilton v. Turner,* Del.Super., 377 A.2d 363 (1977), *appeal dismissed,* Del. Supr., 385 A.2d 717 (1978); *Hiznay v. Strange,* Del.Super., 415 A.2d 489 (1980).

**5.** The pertinent, more complete text of the *Layton* decision reads as follows:

[W]hen an inherently unknowable injury, such as is here involved, has been suffered by one blamelessly ignorant of the act or omission and injury complained of, and the harmful effect thereof develops gradually over a period of time, the injury is "sustained" under § 8118 when the harmful effect first mani-

Del.Super., C.A. No. 80C–FE–8, Walsh, J. (July 19, 1984), another asbestos action. In *Nutt* a summary judgment motion was filed based on a statute of limitations defense. The plaintiff had consulted his family doctor for cold and fatigue symptoms, and an x-ray was ordered, the accompanying report of which indicated findings "strongly suggestive of asbestosis." The plaintiff sought a second opinion of the x-ray and report and was informed that asbestos lung disease was one of several diagnoses possible, but that "we could follow the x-ray over a period of years and see what developed." An annual physical the following year yielded indications of asbestos-related lung disease, but the Court found no clear evidence that such a diagnosis was communicated to the plaintiff. Within a year of the physical the plaintiff received a report from an evaluation at a recognized testing center for asbestos-related ailments and became convinced he had asbestosis; he filed suit four months after discussing the report with his doctor.

The Court applied the holding in *Stagg, supra,* to these facts and concluded:

> ... a material issue of fact exists concerning whether he [plaintiff] acted promptly following his knowledge of the [first] x-ray report. As a layman he is not charged with a sophisticated knowledge of the meaning of the report. He relied upon [the] interpretation and advice [of the doctor who] confirmed the possibility of asbestosis [but] recommended a "wait and see" approach. In view of the fact that plaintiff's physical symptoms, primarily fatigue, were equally attributable to his confirmed diabetic

condition, plaintiff was justified in concluding that [the] lung condition "suggested" by the x-ray report was not a causative factor in his condition. Other factors suggest the reasonableness of plaintiff's attitude. He had received annual physical examinations ... for many years.

> \* \* \* \* \* \*

> This is not a situation in which a person exposed to a dangerous substance ignores a clear warning of harmful effects. Plaintiff explored the implications of the suggestion of asbestos-connected harm through consultation with persons considered knowledgeable. There is no indication he did not follow the advise given him by such persons....

*Nutt, supra* at 5–6.

In applying the holding in *Stagg, supra,* to the case at bar I am satisfied that the harmful effect of the plaintiff's exposure to asbestos, namely, pleural thickening, first manifested itself and became physically ascertainable, such that the plaintiff is chargeable with knowledge that his physical condition was attributable to asbestos exposure, as early as September 4, 1979, but in no event later than January 8, 1980,[6] for the following reasons:

1. The plaintiff was having breathing problems in 1974 which grew progressively worse, and he experienced thickening of saliva and blood-streaked sputum in 1978 and 1979.

2. The plaintiff was advised that he was suffering from "bilateral pleural thickening."

3. While no diagnosis of pulmonary asbestosis was confirmed,[7] the plaintiff

---

fests itself and becomes physically ascertainable. *Layton, supra* at 798.

**6.** The plaintiff was examined by Dr. Chabalko on January 3, 1980 and a report dated January 8, 1980 was mailed to Dr. Altschuler. Dr. Altschuler states by affidavit that it would have been his practice in 1980 to inform Mr. Sheppard of Dr. Chabalko's report that he probably had asbestos-related pleural disease. Thus, I am satisfied that the plaintiff is charged with such

knowledge from either or both doctors not later than January 8, 1980.

**7.** The Court is satisfied that pulmonary asbestosis was ruled out by the doctors who treated the plaintiff prior to Dr. Daum in 1982. Dr. Copman states that "[t]here is no manifestation of active pulmonary disease." (Letter report to Dr. Altschuler, September 4, 1979) Dr. Chabalko's report to Dr. Altschuler (dated January 8, 1980) makes no mention of pulmonary asbestosis but

was advised by Dr. Altschuler that the condition of the "bilateral pleural thickening" was "believed to be a manifestation of asbestosis."

4. The plaintiff was again advised by Dr. Altschuler of the possible connection between the bilateral pleural disease and asbestos exposure and that Dr. Chabalko "could find no other good explanation for its presence."

5. The plaintiff decided to have no further follow-up with Dr. Chabalko's office.[8]

I reach the conclusion that as of January 8, 1980 the plaintiff was not blamelessly ignorant of the clinical diagnosis of pleural thickening and the asserted causal link to asbestos exposure even upon viewing the uncontroverted facts in a light most favorable to the plaintiff. Additionally, this case is, in my view, clearly distinguishable from *Nutt, supra,* since here although Dr. Altschuler and Dr. Chabalko had ruled out pulmonary asbestos they both identified to the plaintiff the health problem of "pleural thickening" and the plaintiff was put on notice of its causal link to his asbestos exposure.

The remaining issue in this matter is, therefore, whether the plaintiff was also chargeable with knowledge in January 1980 so as to begin the running of the statute of limitations against his claim of asbestosis". The operative language in *Stagg, supra* at 43, provides that the limitations period becomes effective when the plaintiff is "chargeable with knowledge that his *physical condition* was attributable to asbestos exposure." (Emphasis added.)

The Court is not unmindful of the special problems surrounding latent disease cases where the same exposure may lead to separate and distinct diseases and the symptoms of each disease may become manifest years apart. An example of this would be a plaintiff who contracts asbestosis (with an average latency period of 17 years) and later also contracts mesothelioma (with an average latency period of 25–40 years). 15 Forum, *supra* at 862, 864. In such cases, if the plaintiff is held to have a single, indivisible cause of action, the statute of limitations begins to run against all claims resulting from asbestos exposure when the plaintiff is chargeable with knowledge that his physical condition is attributable to asbestos exposure; in the hypothetical case of a plaintiff suffering from asbestosis, and, later, mesothelioma, the "physical condition" which first manifests itself would likely be the asbestosis. The plaintiff would then find himself forced to assert in one cause of action his claims for all current and prospective harm. However, Delaware law requires that proof of damages for the future consequences of tortious injuries must be established with reasonable probability of the nature and extent of those consequences. *Henne v. Balick,* Del. Supr., 146 A.2d 394 (1958). The hypothetical plaintiff would, therefore, probably not be able to meet the burden of proof for the future harm caused by the mesothelioma.[9]

---

does discuss pleural disease, and an affidavit of Dr. Altschuler (dated April 25, 1984) on the subject of Dr. Chabalko's report states: "I received a report from Dr. Chabalko dated January 8, 1980, which stated that Mr. Sheppard probably had an asbestos-related pleural disease, but Dr. Chabalko did not find that Mr. Sheppard had pulmonary asbestosis." Dr. Hossain's report speaks only of bronchitis, and a request to Dr. Kestner from the medical superintendent of the DuPont Company for an evaluation of the plaintiff (dated August 28, 1981) mentions only pleural thickening, as does Dr. Kestner's report dated October 27, 1981.

8. The Court notes that Dr. Chabalko's report of January 8, 1980 advised Dr. Altschuler that the plaintiff seemed reluctant to have further investigations performed. Although Dr. Chabalko scheduled the plaintiff for a pulmonary function evaluation and arterial blood gases test, the record contains no information regarding whether the tests were performed or the results of any tests.

9. The traditional American rule of "reasonable probability" requires a greater than 50% likelihood of the occurrence of the harm, *see Wilson, supra* at 119, whereas the likelihood of an asbestosis sufferer later contracting mesothelioma is

The Court notes, however, a growing recognition of the problems inherent in applying traditional statutes of limitations to latent disease cases. This has resulted in the erosion of the doctrine of the single, indivisible cause of action in tort cases. In *Wilson v. Johns-Manville Sales Corp.*, 684 F.2d 111 (D.C.Cir.1982), the court held that a diagnosis of "mild asbestosis" did not start the running of the statute of limitations on the plaintiff's right to sue for the separate and distinct disease of mesothelioma, attributable to the same asbestos exposure, but not manifest until after the statute had run on the asbestosis claim. *Wilson, supra* at 120–121.

The court reasoned that the traditional American rule, that damages based on future consequences be allowed only if the consequences are reasonably certain, would limit the recovery of the plaintiff in question to the harm already manifested and would not compensate him for his mesothelioma since no symptoms of mesothelioma appeared until after the statute of limitations had run. *Wilson, supra* at 119–120. Concluding that cumulative disease cases are different from ordinary accident or disease situations, and that an injustice would result unless the plaintiff were allowed recovery for the mesothelioma caused by asbestos exposure, the court allowed the plaintiff to pursue a second cause of action for mesothelioma. The court found that the interests of judicial economy supported its position because, absent a divisible cause of action, plaintiffs would be tempted to commence litigation at the slightest symptom resulting from asbestos exposure (although they might never contract a more serious disease), even in cases where worker's compensation or private insurance should provide an adequate remedy. In addition, the court saw the possibility of protracted litigation and delay prompted by plaintiffs who wished to ascertain the full extent of the asbestos harm caused them before their case was set for trial. The court concluded:

approximately 12–15%. *Wilson, infra* at 120, n. 45.

[A] potential defendant's interest in repose is counterbalanced and outweighed by other factors, including evidentiary considerations, securing fair compensation for serious harm, and deterring uneconomical anticipatory lawsuits.

*Wilson, supra* at 120. *See also Fearson v. Johns-Manville Sales Corp.*, 525 F.Supp. 671 (D.C.1981).

Other jurisdictions which allow time of discovery or manifestation exceptions to toll the statute of limitations have followed a similar line of logic to allow the splitting of a cause of action. *Pierce v. Johns-Manville Sales Corp.*, Md.App., 296 Md. 656, 464 A.2d 1020 (1983) (allowing a claim for lung cancer where no tort recovery was ever sought for asbestosis although the plaintiff suffered both diseases); *Martinez-Ferrer v. Richardson-Merrell, Inc.*, Cal. App., 105 Cal.App.3d 316, 164 Cal.Rptr. 591 (1980) (recognizing a separate cause of action for limitations purposes created by the independent and non-simultaneous injuries of dermatitis and cataracts resulting from the taking of an anti-cholesterol drug); *Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506 (5th Cir.1984) (holding that Mississippi would apply the discovery rule and would divide a cause of action so that a claim for mesothelioma could be asserted in addition to the plaintiff's present claim for asbestosis); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 574 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977) (applying New Jersey law to allow separate causes of action for thrombophlebitus and cancer resulting from the taking of a contraceptive drug on the rationale that the two diseases were not products of the same "chain of causality"); *Devlin v. Johns-Manville Corp.*, 202 N.J.Super. 556, 495 A.2d 495, Keefe, J. (1985); *contra Connelly v. Paul Ruddy's Equipment Repair & Service Co.*, Mich. Supr., 388 Mich. 146, 200 N.W.2d 70 (1972) (holding for the indivisibility of a tort cause of action); *Matthews v. Celotex*, 569 F.Supp. 1539 (D.N.D.1983) (holding, pursu-

ant to North Dakota law, that a single cause of action cannot be divided). *See also Anderson v. Sybron Corp.*, Ga.App., 165 Ga.App. 566, 299 S.E.2d 160, *aff'd*, 251 Ga. 593, 310 S.E.2d 232 (1983) (allowing a claim for cataracts after plaintiffs had experienced other illnesses resulting from exposure to an industrial chemical on the theory of a continuing tort).

 I am convinced that the logic of *Wilson, supra,* and the other cited cases is compelling when balanced against the injustice that the doctrine of the indivisibility of a cause of action works upon the plaintiff who suffers a series of asbestos-related diseases over time as a result of the life-consuming maturation of the harm from asbestos exposure. As noted by the court in *Wilson, supra* at 118, statutes of limitations "find their justification in necessity and convention rather than in logic" (*citing Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945)). The Court is satisfied that latent disease cases justify a change in our perception and application of the statute of limitations to the end that a plaintiff with the misfortune of contracting more than one asbestos-related ailment over a long period of time not be without a remedy for the later and generally more serious and inherently unknowable claims.

 In the instant case, therefore, the Court holds that the plaintiff became "chargeable with the knowledge that his physical condition was attributable to asbestos exposure," *Stagg, supra,* Del.Super., at 43, Del.Supr. at 1154, for purposes of his claims based upon pulmonary asbestosis, on May 24, 1982 when he was diagnosed as suffering from asbestosis by Dr. Daum.

The defendants' Motion for Summary Judgment is, therefore, hereby granted as to plaintiff's claim related to pleural thickening or asbestos-related pleural disease; Summary Judgment is, therefore, hereby denied with respect to plaintiff's claims based upon pulmonary asbestosis.

IT IS SO ORDERED.