# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WAYNE WEST and CYNTHIA WEST, | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. N21C-08-265 MAA |
| | ) | |
| v. | ) | |
| | ) | |
| PATTERSON-SCHWARTZ & | ) | |
| ASSOCIATES, INC. and | ) | |
| WASHINGTON STREET REALTY CO., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

Submitted: March 4, 2024
Decided: May 10, 2024

*Upon Defendants' Motion For Summary Judgment:*
**GRANTED.**

## <u>MEMORANDUM OPINION</u>

David Crumplar, Esquire, of JACOBS & CRUMPLAR, P.A., Wilmington, Delaware, Attorney for Plaintiffs.

R. Karl Hill, Esquire, of SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, Delaware, Attorney for Defendants.

**Adams, J.**

# I.    INTRODUCTION

Plaintiff Wayne West ("Mr. West") worked for Patterson-Schwartz & Associates ("Patterson-Schwartz"), a tenant of Washington Street Realty's ("Washington Street," and together with Patterson-Schwartz, "Defendants") Newark office, for many years.  Mr. West suffers from numerous health issues, including respiratory problems, which he asserts were caused, or at least exacerbated, by working in the Newark office.  Mr. West filed suit against Defendants, alleging that mold found in the Newark office in 2019 caused his injuries.  Defendants seek summary judgment, arguing Mr. West's claims for injuries from mold exposure arose much before Mr. West's office was tested (and confirmed) for mold in October 2019, and are therefore time-barred by the statute of limitations.  For the reasons that follow, the motion for summary judgment is GRANTED.

# II.    FACTS

Mr. West has worked as a real estate sales associate with Patterson-Schwartz since 1986.[1]  The Newark office of Patterson-Schwartz is located at 680 South College Avenue ("the Newark Office").[2]  Mr. West always worked for Patterson-

---

[1] Defs.' Opening Br. in Supp. of Mot. for Summ. J. [hereinafter "Defs.' Br."], Ex. D, Dep. of Wayne M. West [hereinafter "Mr. West Dep."] at 8:22–9:1.  Cynthia West ("Mrs. West") is Mr. West's wife (together with Mr. West, "Plaintiffs").  Compl. ¶¶ 32–33.  Mrs. West's claim is solely for loss of consortium.

[2] Defs.' Br., Ex. C, Dep. of Christopher J. Cashman [hereinafter "Cashman Dep."] at 7:18–20.

Schwartz at the Newark Office.[3]  Non-party Christopher Cashman ("Cashman") is the sales manager of the Newark Office.[4]

Washington Street is the landlord and owner of the Newark Office and is responsible for building maintenance.[5]  Washington Street and Patterson-Schwartz share similar ownership.[6]

Mr. West has numerous medical issues—which he has suffered for years—including annual sinus infections since 2006.[7]  By Mr. West's own admission, he had been "coughing and hacking and had trouble breathing for several years" prior to October 2019.[8]  At least as early as 2014, Mr. West also complained to Mrs. West about a leak in his office ceiling.[9]  At a work-related holiday party in 2014, Mr. West was coughing, and reflected in his deposition that "it seemed like whenever I was in the office I was coughing."[10]

Mr. West repeatedly informed Cashman of his concerns regarding his office.[11]  At a 2016 Christmas party, Mr. West told Cashman there must be something in the

---

[3] Mr. West Dep. at 8:13–9:14.

[4] Cashman Dep. at 6:5–8:3.

[5] *Id.* at 11:20–12:10.

[6] *Id.* at 11:24-12:6; 34:11–17.

[7] Mr. West's sinus infections have increased in frequency since 2010.  Mr. West Dep. at 55:17–56:23.

[8] *Id.* at 117:17–118:7.

[9] Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. [hereinafter "Pls.' Opp'n"], Ex. L, Dep. of Cynthia West at 9:11–21.

[10] Mr. West Dep. at 129:17–131:13.

[11] *Id.* at 131:14–21.

office making him sick.[12]  Both times, Cashman said Mr. West must be imagining it because no one else was sick.[13]  According to medical records, Mr. West experienced dyspnea (shortness of breath) on exertion in October of 2017.[14]  At a 2018 office party, Mr. West was coughing profusely, and Cashman again denied that the office was the cause because no one else was sick.[15]

In an effort to determine the cause of his symptoms, Mr. West hired Anthony Meloro ("Meloro") from AAA Dry Foam to inspect Mr. West's house in 2016.[16] Mr. West asked Meloro to test his house for "anything making [him] sick" after seeing TV advertisements about the impact of mold.[17]  Meloro found nothing.[18]  In 2018, Mrs. West noticed spots on the ceiling of the Wests' house, so Meloro inspected again, and found mold in the attic, but it was determined to not have spread to the living space of the house.[19]  Mr. West had the mold abated.[20]

In July 2019, Dr. Richard Kim diagnosed Mr. West with mold allergies.[21]  On October 16, 2019, a day in which it was "pouring rain," Mr. West could not breathe

---

[12] *Id.* at 133:4–134:7.
[13] *Id.* at 134:16–135:1.
[14] *Id.* at 79:18–80:7.
[15] Defs.' Br., Ex. E [hereinafter "Day Timer notes"] at PLF 1096.  Mr. West kept detailed notes in his Day Timer—a note-taking tool Mr. West regularly recorded his personal observations in.  *See* Mr. West Dep. at 127:13–15 (describing Mr. West's use of the Day Timer as "all my notes that I keep in my Day-Timer regarding everything").
[16] Mr. West Dep. at 122:20–123:19.
[17] *Id.*
[18] *Id.* at 124:7–14.
[19] *Id.* at 119:2–121:24.
[20] *Id.* at 120:2–10.
[21] *Id.* at 91:3–7.

4

upon entering his office.[22] Mr. West took photos of the water dripping from the foil-wrapped tile.[23] Mr. West emailed Cashman his concerns about mold in his office as a result of the rain.[24] On October 23, 2019, Cashman informed Mr. West that AAA would conduct a mold test on Mr. West's office.[25] On October 29, 2019, Cashman told Mr. West that mold was found in his office.[26] Mr. West stated in deposition that "[i]t's very possible" that his symptoms got progressively worse because of the building.[27] No mold testing was performed in the Newark Office prior to 2019.[28]

Between November 2019 and January 2020, Mr. West "became sicker," and was "coughing and having breathing issues."[29] Since January 2020, Mr. West entered the Newark Office "a couple of times" for "probably two or three minutes," "had trouble breathing and [] left" and "ended up with sinus infections."[30] Mr. West learned of his mold allergies and permanent lung damage prior to October 2019.[31] Mr. West has also dealt with bronchitis, asthma, and other allergies.[32]

---

[22] *Id.* at 138:10–21.
[23] *Id.* at 140:24–141:14.
[24] Defs.' Br., Ex. F at PSA/WSR 0097.
[25] *Id.* at PSA/WSR 0099; Cashman Dep. at 23:20–24:16.
[26] Day Timer notes at PLF 1097; Defs.' Br., Ex. B, Dep. of Charles E. Schwartz at 14:12–15:11.
[27] Mr. West Dep. at 118:8–16.
[28] Cashman Dep. at 19:17–20.
[29] Mr. West Dep. at 13:13–24.
[30] *Id.* at 15:1–20.
[31] *Id.* at 57:3–58:2.
[32] *Id.* at 58:8–18; 70:11–14; 84:19–85:5; 88:12–91:7; 102:15–105:16; 107:20–108:8.

## III. PROCEDURAL HISTORY

On August 30, 2021, Plaintiffs filed a Complaint alleging six counts: (I) Negligent Maintenance of the Building; (II) Failure to Warn; (III) Breach of the Implied Warranty of Habitability; (IV) Strict Liability; (V) Willful and Wanton Conduct of the Defendants; and (VI) Loss of Consortium.[33]  On January 7, 2022, Defendants filed an Answer and Affirmative Defenses.[34]  On January 16, 2024, Defendants filed its Opening Brief in Support of its Motion for Summary Judgment asserting that all claims were barred by the Statute of Limitations.[35]  Briefing concluded on February 8, 2024.  The Court held oral argument on March 4, 2024 and reserved decision.[36]

## IV. STANDARD OF REVIEW

Summary judgment will be granted when "there are no material issues of fact in dispute and the moving party is entitled to judgment as a matter of law."[37]  The facts, and any reasonable inferences therefrom, "must be viewed in the light most

---

[33] D.I. 1.  The Complaint lists alleged facts under the heading "Count I" with the counts beginning at heading "Count II," and proceeding, with two "Count IV" headings.  For clarity, this decision will refer to the counts as they are listed in this Procedural History section, rather than as listed in the Complaint.

[34] D.I. 8.

[35] D.I. 45.  In Plaintiffs' Opposition Brief, Plaintiffs stated they "are willing to dismiss their implied warrant [sic] of habitability, and strict liability claims."  D.I. 49, Pls.' Opp'n at 2.  The Court therefore considers Counts III and IV withdrawn.

[36] D.I. 53.

[37] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 241 (Del. 2009).

favorable to the nonmoving party."[38] "If, however, the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record, then summary judgment will not be granted."[39] If the movant meets its initial burden, then "the non-movant must show there is a 'genuine issue for trial.'"[40]

## V. ANALYSIS

For the reasons that follow, the Court holds that Plaintiffs' claims are time-barred by the statute of limitations, and Plaintiffs have not met the burden of proving an exception applies. The Court, therefore, grants Defendants' motion.[41]

### A. Overview of the Statute of Limitations for Personal Injury Actions

Claims for personal injuries must be brought within two years of the date of injury.[42] Delaware has adopted the "occurrence rule" for the statute of limitations,

---

[38] *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 191 (Del. 2009) (citing *Williams v. Geier*, 671 A.2d 1368, 1375 (Del. 1996)).

[39] *Pazuniak Law Off., LLC v. Pi-Net Int'l, Inc.*, 2016 WL 3916281, at *2 (Del. Super. July 7, 2016) (citing *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962)).

[40] *Trustwave Hldgs., Inc. v. Beazley Ins. Co.*, 2024 WL 1112925, at *8 (Del. Super. Mar. 14, 2024) (quoting Del. Super. Ct. Civ. R. 56(e)).

[41] Defendants raise in a footnote in the Opening Brief that the duty to warn claim (Count II) should be dismissed. Defs.' Br. at 10–11 n.2. Plaintiffs dispute this. Pls.' Opp'n at 18–19. The Court deems this issue moot because all counts are dismissed on statute of limitations grounds. Defendants also raise for the first time in a footnote in the Reply Brief that "willful and wanton conduct, a punitive damages standard but set forth as Count V is not a cause of action and cannot be awarded in negligence claims." Defs.' Reply at 1 n.2. The Court first notes that this argument has been waived for failure to raise it in the Opening Brief. *See, e.g.*, *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived. [Plaintiff] has waived any argument it had against [defendant] by not raising the issues in their opening brief[.]"). The Court also deems the issue moot because all counts are dismissed under the statute of limitations.

[42] *See* 10 *Del. C.* § 8119.

"meaning a cause of action accrues 'at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action.'"[43]

Under Delaware law, there are three circumstances in which the running of the statute of limitations can be tolled. These exceptions include: 1) fraudulent concealment; 2) inherently unknowable injury (the "Discovery Rule"); and 3) equitable tolling.[44] Fraudulent concealment and equitable tolling are not at issue in this action. The Discovery Rule tolls the statute of limitations "when the injury is 'inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and injury complained of.'"[45] If the Discovery Rule applies, the statute of limitations tolls until the plaintiff "discovers the 'facts 'constituting the basis of the cause of action[, considered "actual notice,"] *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery' of such facts[, also called "inquiry notice"].'"[46] The tolling stops when the "plaintiff discovers, or in the exercise of reasonable diligence should have

---

[43] *ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 732 (Del. 2020) (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004)).
[44] *Krahmer v. Christie's Inc.*, 911 A.2d 399, 407 (Del. Ch. 2006) (internal citations omitted).
[45] *ISN Software Corp.*, 226 A.3d at 733 (citing *Wal-Mart Stores, Inc.*, 860 A.2d at 319).
[46] *Lehman Brothers Hldgs., Inc v. Kee*, 268 A.3d 178, 186 (Del. 2021) (quoting *Wal-Mart Stores, Inc.*, 860 A.2d at 319) (emphasis in original). *See also See Burrell v. AstraZeneca LP*, 2010 WL 3706584, at *6 (Del. Super. Sept. 20, 2010) (citing *Brown*, 820 A.2d at 368 n.21).

8

discovered, that there is a connection between [the] injury and the alleged defective product."[47]

The Parties here appear to concede that under an actual notice standard, the positive test for mold in the office would fall within the two-year period. The issue, therefore, is whether the Plaintiffs were on inquiry notice before that time.

Summary judgment will be granted as to inquiry notice "if there is a 'red flag' that 'clearly and unmistakably' would lead a prudent person to investigate and thereby discover the basis for the cause(s) of action alleged."[48] Inquiry notice only requires that "the plaintiff becomes aware of 'facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery [of the injury].'"[49]

## B.    The Parties' Contentions

Defendants, relying on *Duncan v. O.A. Newton & Sons Co.*,[50] argue that Mr. West was on inquiry notice of his claim no later than April 2016, when the tests for mold in his home were negative.[51] In *Duncan*, the Superior Court of Delaware determined that the statute of limitations begins to run "not when all the dots have

[47] *Bredberg v. Boston Sci. Corp.*, 2021 WL 2228398, at *3 (Del. Super. June 2, 2021) (citing *Brown v. E.I. duPont de Nemours & Co.*, 820 A.2d 362, 366 (Del. 2003)).
[48] *Ocimum Biosolutions (India) Ltd. v. AstraZeneca UK Ltd.*, 2019 WL 6726836, at *8 (Del. Super. Dec. 4, 2019) (citing *Boerger v. Heiman*, 965 A.2d 671, 675 (Del. 2009)).
[49] *Gen-E, LLC v. Lotus Innovations, LLC*, 2022 WL 2063307, at *2 (Del. Super. Apr. 21, 2022) (quoting *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *7 (Del. Ch. Jan. 24, 2005)).
[50] *Duncan v. O.A. Newton & Sons Co.*, 2006 WL 2329378 (Del. Super. July 27, 2006).
[51] Defs.' Br. at 13.

been connected" but when the plaintiff is "reasonably on notice that [the] medical complaints may be attributable to the mold[.]"[52]  The court held that the plaintiff was not "blamelessly ignorant" when she was objectively sick, had samples of the mold in her home, and had been advised by doctors of the symptoms of toxic mold and the risks of remaining around it.[53]  The court declined to toll notice until the samples had been tested because the plaintiff already had the other warnings and chose not to act.[54] Defendants assert that Mr. West similarly had notice because he was aware of the harm mold can cause, he was suffering symptoms matching those of mold exposure, had eliminated his home as the cause, and suspected the office was the cause, but failed to inquire further.[55]

Plaintiffs dispute that the statute of limitations has run, relying on the four factors for inquiry notice used for latent disease cases.[56]  Plaintiffs, citing *DaBaldo v. URS Energy and Construction,*[57] argue that Mr. West was not on notice until he was diagnosed with mold-related issues in 2019, and had a doctor link his allergy to his workplace in 2021.[58]  In *DaBaldo*, the Supreme Court of Delaware held a complaint

---

[52] *Duncan*, 2006 WL 2329378, at *7.
[53] *Id.* at *8.
[54] *Id.*
[55] Defs.' Br. at 14–15.
[56] Pls.' Reply at 14.  *See infra* Section V.C.
[57] *DaBaldo v. URS Energy & Constr.*, 85 A.3d 73 (Del. 2014).
[58] Pls.' Reply at 15–16.  Mr. West first learned in July 2019 that he was allergic to mold.  *Id.* at 15. On October 29, 2019, Mr. West learned that mold was found in his office.  *Id.*  On August 9, 2021, a medical doctor first linked Mr. West's health issues with his exposure to mold at work.  *Id.*

was not time-barred when the plaintiff knew he had asbestos-related pleural disease a decade before he was diagnosed with, and sued for, asbestosis.[59] The court noted that Delaware is a multi-disease jurisdiction, meaning "that each diagnosis attributable to asbestos exposure is a separate claim and thus is subject to its own statute of limitations."[60] The Supreme Court held the clock for the second disease did not begin to run until the plaintiff received the second diagnosis.[61]

Plaintiffs attempt to compare this case with *DaBaldo*, where the plaintiff was not on notice until he was diagnosed with asbestosis. Plaintiffs here argue, "in short, you cannot file a claim for a disease you do not have[,]"[62] and Mr. West was not diagnosed with mold allergies until 2019. Plaintiffs distinguish Defendants' use of *Duncan*, arguing that Mr. West did not know that there was a mold issue until 2019, unlike the plaintiff in *Duncan* who found evidence of mold in her home and was warned of the risks by doctors.[63] The Court notes that Mr. West received his mold allergy diagnosis in July 2019,[64] more than two years prior to filing the Complaint on

---

[59] *Id.* at 77–79.

[60] *Id.* at 77 (requiring the alternative would force a plaintiff to sue on the first diagnosis then speculate to prove future damages of potential future asbestos-related diseases and likely fail to satisfy the burden of proof—a hypothetical which the court noted was unjust) (citing *Sheppard v. A.C. & S. Co.*, 498 A.2d 1126, 1132–34 (Del. Super. 1985)).

[61] *Id.* at 79–80.

[62] Pls.' Opp'n at 14–15.

[63] *Id.* at 17.

[64] Pls.' Reply at 15.

11

August 30, 2021,[65] so on the diagnosis-argument alone, Plaintiffs have unintentionally conceded that the Complaint was filed outside of the two year period.

Defendants also criticize Plaintiffs' reliance on asbestos cases, which have a long latency period, because Mr. West's symptoms occurred immediately or shortly after being exposed.[66] Defendants argue that facts in the record support inquiry notice on their own, let alone when considered together, including: (1) when Mr. West received a negative mold test on his home; (2) when Mr. West saw the advertisement linking mold to his symptoms; and (3) when Mr. West continually believed the cause was his office.[67]

## C. The Asbestos Approach is not Appropriate for Mold-Related Injuries

The line between inquiry notice and actual notice is often blurred for asbestos-related injuries because of the length of the latency period.[68] In *In re Asbestos Litigation*,[69] the Supreme Court of Delaware noted that "[f]ixing the period of limitations in asbestos exposure cases is often problematic because of the

---

[65] D.I. 1.

[66] Defs.' Reply at 12–14.

[67] *Id.* at 16–17.

[68] *See, e.g.*, *DaBaldo*, 85 A.3d at 79 ("In latent disease cases, the plaintiff may toll the commencement of the statute of limitations under the discovery rule if he 'acted reasonably and promptly in seeking a diagnosis and in pursuing the cause of action.'") (internal citations omitted); *Brown*, 820 A.2d at 367 ("[T]his Court and the Superior Court have applied the discovery exception to deter the running of the Section 8119 limitations period in circumstances where the plaintiff has been exposed to a toxic substance, but the nature of the injury involves a latency period where the harmful effects of the toxic exposure are not discoverable for several years. Asbestos claims are the most notable examples.") (internal citations omitted).

[69] *In re Asbestos Litig.*, 673 A.2d 159 (Del. 1996).

acknowledged latency period in the development of diseases associated with asbestos."[70] The Supreme Court clarified that the statutory period "begins to run when the plaintiff is chargeable with knowledge that his condition is attributable to asbestos exposure."[71] Knowledge of asbestos exposure does not alone start the clock "where there is uncertainty in medical diagnosis."[72]

The Supreme Court in *In re Asbestos Litigation* discussed the four factors for trial courts to consider in latent disease cases to determine whether the statute of limitations has commenced: "(1) the plaintiff's level of knowledge and education; (2) the extent of his recourse to medical evaluation; (3) the consistency of the medical diagnosis; and (4) plaintiff's follow-up efforts during the period of latency following initial recourse to medical evaluation."[73] As the Supreme Court recognized:

> These inquiries are, by nature, fact-intensive and are subject to disposition as a matter of law only where the facts, viewed in favor of the non-movant, predominate toward the conclusion that the plaintiff is chargeable with knowledge that his harmful physical condition was attributable to asbestos exposure.[74]

The Supreme Court, in reversing the trial court's decision, determined that summary judgment was not appropriate where facts about the plaintiff's knowledge were

---

[70] *Id.* at 162 (citing *Bendix Corp. v. Stagg*, 486 A.2d 1150, 1152 (Del. 1984)).
[71] *Id.*
[72] *Id.*
[73] *Id.* at 163.
[74] *Id.*

controverted.[75]  In that particular case, the plaintiff's subjective belief of asbestos exposure in 1980 was controverted by medical testing disputing that exposure, creating a question of fact as to whether or not the plaintiff had notice of the injury.[76]

The Court finds that Plaintiffs' use of asbestos cases is unsuitable for mold-related cases because of the different latency periods for each sickness.  In asbestosis cases for example, "[i]t may be many years before the presence of scar tissue can be detected, and still longer before the scar tissues reach a level as to impair or incapacitate the lung."[77]  The average latency period, consequently, is about 20 years from the date of exposure, but may take as long as 50 years.[78]  Mold, in comparison, has not been recognized by courts as having any latency period at all.[79]

Specifically in this case, Mr. West does not argue that his symptoms were delayed in manifesting; he acknowledges that almost immediately upon entering the office in October 2019 he struggled to breathe.[80]  This differs from individuals exposed to asbestos who may not experience any physical symptoms from that exposure for years.  With no evidence in the record to suggest Mr. West's reaction to

---

[75] *Id*.  "Where the record for summary judgment purposes is incomplete or conflicting, issues turning on knowledge are not subject to disposition as a matter of law."  *Id*.

[76] *Id.*

[77] *Bendix*, 486 A.2d at 1152.

[78] *Id.*

[79] *See, e.g.*, *Duncan*, 2006 WL 2329378, at *7–8 (noting the latency period for asbestos, but not considering any deferred onset of symptoms from toxic mold as relevant to the Discovery Rule analysis).

[80] *See, e.g.*, Mr. West Dep. at 138:10–142:12.  Mr. West also produced photographs of the damage to his office from the rain.  *Id.*

mold was a latent disease, the Court does not need to consider the four factors for latent disease inquiry notice as Plaintiff suggests. Neither the case law nor these facts support conflating the latent disease approach to mold-related injuries, so this Court declines to do so. This Court also notes that other jurisdictions have similarly applied inquiry notice to mold exposure, rather than waiting for a medical diagnosis before running the statute of limitations.[81]

Similarly, the multi-disease approach from *DaBaldo* does not apply to the facts. Mr. West indicated that the Newark Office made his symptoms "worse"—not new—suggesting the underlying cause of Mr. West's symptoms was the mold allergy. A medical diagnosis has been crucial for asbestos cases because of the different latency periods for different asbestos-related diseases. The Court is unconvinced that Mr. West needed a diagnosis of allergies to know mold would be harmful to him, especially since Mr. West already acknowledged the risk of mold when he had his home tested. *DaBaldo* does not automatically toll all diagnoses,

---

[81] *See, e.g.*, *Gerke v. Romero*, 237 P.3d 111, 116 (N.M. App. 2010) (declining the plaintiff's argument that he needed a medical diagnosis of mold poisoning and instead applied the Discovery Rule such that "when the claimant in a toxic mold case experiences physical symptoms that would cause an ordinary person to make an inquiry about the discovery of the cause of the symptoms, that is the point at which the statute of limitations begins to accrue"); *Marcinkowski v. Castle*, 870 N.Y.S. 2d 206, 207 (N.Y. App. Div. 2008) ("Defendant established as a matter of law that plaintiff discovered the injuries in November 1998, when he became symptomatic[.]"); *Pirtle v. Kahn*, 177 S.W. 3d 567, 573–74 (Tex. App. 2005) (finding mold exposure is not a latent disease and applying the Discovery Rule to find plaintiff was on notice once she found what she suspected was mold); *Wyckoff v. Mogollon Health All.*, 307 P.3d 1015, 1018 (Ariz. Ct. App. 2013) ("The cause of action begins to accrue when the claimant experiences physical signs and symptoms of illness, knows that she has been exposed to mold, and knows that mold may present a health hazard.").

only those related to asbestos, and this Court does not believe it is appropriate to expand that application to mold.

**D.   The Record does not Suggest that the Cause of Mr. West's Injury was Unknown**

The Supreme Court of Delaware's decision in *Brown v. E.I. duPont de Nemours and Co., Inc.* discusses Delaware's standard for tolling a statute of limitations when the cause of an injury is entirely unknowable.[82]   In *Brown*, the Supreme Court of Delaware tolled the statute of limitations because "legal injuries" were not sustained until the plaintiffs could attribute a particular injury to its cause.[83] The plaintiffs in *Brown* alleged that the exposure of pregnant mothers to Benlate caused birth defects in their children.[84]  Expert reports linking Benlate to birth defects were released in 1996, more than two years after the exposed children were born.[85]

Unlike in asbestos cases, where the injury manifests over time, in *Brown*, the children were already injured, but were unaware of the cause.[86]  The Supreme Court noted that "[t]he limitations period for a toxic tort does not begin immediately upon the onset of physical problems if the symptoms are reasonably attributable to another

---

[82] 820 A.2d 362 (Del. 2003).

[83] *Id.* at 364 ("The applicable statute of limitations begins to run when injuries are 'sustained.'  We hold that the commencement of the limitations period here is deferred until the plaintiffs were on notice that the birth defects were potentially actionable injuries because legal injuries were not sustained until that time.").

[84] *Id.*

[85] *Id.* at 365.

[86] *Id.* at 368.

16

cause and the plaintiff is not on notice of the tortious cause."[87]  Relying on *In Re Asbestos Litigation*, *Brown* held that the "physical condition [] could not be attributed to a tortious injury until someone from the scientific community found and revealed publicly a link between the physical condition and the exposure to the toxic substance."[88]  The statute of limitations did not begin to run until the plaintiffs had knowledge that they had sustained a *legal* injury—until the scientific evidence linked the birth defects to the toxic exposure.[89]

Plaintiffs assert that the lack of positive mold test means that Mr. West was not on inquiry notice, but this is undermined by his own admissions.  Mr. West suspected mold was causing his symptoms in 2016 after viewing the television commercial and testing his own home for mold.  Mr. West repeated in his deposition, and in his Day Timers, that he was convinced that it was the office making him sick for years prior to 2019.[90]  Mr. West was then diagnosed with a mold allergy in July 2019.[91]

The fact that Cashman told Mr. West that Mr. West must be wrong does not release Mr. West from inquiry notice.  The record does not show any medical evidence contradicting Mr. West's health concerns.  Unlike asbestos-related injuries,

---

[87] *Id.*

[88] *Id.*

[89] *Id.* at 368–69.

[90] *See* Mr. West Dep. at 117:17–24; 118:3–12; 132:1–4; 135:2–9; Day Timer notes at PLF 1096 (noting water leak stains in Mr. West's office as early as 04/14/2014).

[91] Mr. West Dep. at 91:3–7.

mold's harmful effects are well-known,[92] so Mr. West cannot be charged with reasonably relying on another lay person dismissing Mr. West's claims as an escape from being on notice. Mr. West does not assert that he asked for testing to be done prior to 2019 and that Cashman or the building itself refused. Instead, Mr. West's testimony is clear, that despite raising concerns that "the office" was making him sick, once he showed Cashman the pictures of the leak's damage, Defendants immediately tested for mold. Plaintiffs' distinction from the plaintiff in *Duncan*[93] is unpersuasive because while Mr. West did not have mold samples, and only took pictures in October 2019, as already discussed, he suspected mold as early as 2016 and failed to get answers, just like the *Duncan* plaintiff. Mr. West also learned that he was allergic to mold in July 2019, but failed to request a mold test on his office until October 2019.[94]

### E. Even Without a Diagnosis, the Record Shows Mr. West Knew that Mold Could be Harmful

In *Burrell v. AstraZeneca LP*, the Superior Court discussed the standard by which a "notice of a potential tort claim" must be measured.[95] As the court in *Burrell*

---

[92] *See, e.g.*, *Brandt v. Rokeby Realty Co.*, 2006 WL 1942314, at *23 (Del. Super. July 7, 2006) ("[W]hether a particular individual develops symptoms when exposed to molds depends on a variety of factors[.]") (citing NEW YORK CITY DEP'T OF HEALTH & MENTAL HEALTH, *Guidelines on Assessment and Remediation of Fungi in Indoor Environments*).

[93] *See supra* Section V.B.

[94] Defs.' Br., Ex. F at PSA/WSR 0097. While the Court does not hold that a diagnosis is required for inquiry notice, the diagnosis coupled with Mr. West's negative home test undeniably put Mr. West on inquiry notice at the latest in July 2019, more than two years before the Complaint was filed.

[95] 2010 WL 3706584 (Del. Super. Sept. 20, 2010).

18

pointed out, the standard is not "actual notice," but "inquiry notice."[96]  In *Burrell*, the plaintiffs argued they were not on notice of their injury until they saw a television advertisement linking their use of the drug, Seroquel, with their diabetes diagnosis.[97] The record indicated that both medical and lay sources had linked Seroquel and diabetes since 2003, which was both before the plaintiffs' diagnosis of diabetes, and after the plaintiffs begun taking Seroquel.[98]  The court, in finding that plaintiffs were on inquiry notice more than two years prior to filing their lawsuit, held "had [p]laintiffs engaged in a reasonable investigation of publicly available sources as of [their diagnosis with diabetes], each of them would have discovered facts that would have provided 'notice of a *potential* (as opposed to a guaranteed) tort claim[.]"[99] Therefore, regardless of plaintiffs' actual knowledge upon seeing the advertisement, the plaintiffs could have otherwise had knowledge through inquiry notice, so their claims were barred by the statute of limitations.[100]

Similar to *Burrell*, Mr. West was on *potential* notice in 2016 when he saw an ad warning of the mold risks and tested his home.  Unlike *Burrell*, Mr. West saw the television ad and it prompted Mr. West to act, but Mr. West failed to continue his inquiry.   Mr. West could have directed Cashman to his concerns about mold

---

[96] *Id.* at *6.
[97] *Burrell*, 2010 WL 3706584, at *5–6.
[98] *Id.* at *6.
[99] *Id.*  (emphasis in original).
[100] *Id.*

19

specifically when Mr. West became aware of the risks in 2016 and after subsequent tests for mold in Mr. West's house came back negative. At this point, Mr. West should have continued to inquire as to whether his office was the source of his mold allergies—as he suspected as early as April 7, 2016 in his Day Timers.[101] As case law suggests, a red flag, putting the prudent person on notice[102] occurred here, and Mr. West failed to follow through with his concerns.[103]

## VI. CONCLUSION

In conclusion, Defendants' motion for summary judgment is GRANTED because Plaintiffs' claims are time-barred by the statute of limitations.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams
**Meghan A. Adams, Judge**

---

[101] Day Timer notes at PLF 1096 ("Anthony Meloro of AAA dry foam came to my home to see if I had any mold issues because I was constantly sick and concerned of mold issues. . . .").

[102] *See, e.g.*, *Ocimum Biosolutions (India) Ltd.*, 2019 WL 6726836, at *8 (citing *Boerger*, 965 A.2d at 675).

[103] The Court notes that summary judgment is only appropriate where the facts are not in dispute; if the facts are contested, then the dispute is best left for the fact-finder to decide at trial. *See DaBaldo*, 85 A.3d at 79 ("'When either plaintiff's knowledge or the reasonableness of his actions are in dispute in the light of conflicting evidence in the record[,] the issue is best left to the jury.'"). *When* Mr. West was on notice of his injury is an interpretation of the law on inquiry and actual notice. The Parties all agree as to the timeline of when Mr. West experienced symptoms, and what his corresponding knowledge was at that time—the Day Timers in particular provide this information. With no dispute as to the facts, it is appropriate for the Court to make the legal determination as to what "notice" is for the statute of limitations to commence without deferring to the fact-finder.

20